UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| TIMOTHY DeBRITTO,<br>        Plaintiff,<br><br>v.<br><br>PATRICIA COYNE-FAGUE,<br>DIRECTOR, DEPT. OF CORRECTIONS,<br>        Defendant. | No. 1:21-cv-00017-MSM |

## MEMORANDUM & ORDER

Mary S. McElroy, United States District Judge.

## I.  INTRODUCTION

On March 9, 2020, the Governor of the State of Rhode Island declared a state of emergency caused by the appearance in Rhode Island of documented cases of the horrifically contagious and dangerous COVID-19 virus. *See* Executive Order 20-02, governor.ri.gov/documents/orders/Executive-Order-20-02.pdf. On March 11, the World Health Organization declared COVID-19 a global pandemic. https://www.statnews.com/2020/03/11/who-declares-the-coronavirus-outbreak-a-pandemic/. And, on March 13, 2020, a national emergency was declared. Pres. Proc. No. 9994, 85 FR 15337, 2020 WL 1272563 (Pres.).

Congregant residential settings, in particular nursing homes and prisons, were quickly identified as locations presenting a unique and high risk of contagion. As the infection spread throughout the United States (and the World), it seemed to sweep even more quickly through residential settings such as those, where inhabitants lacked the means, physical ability, or freedom to remove themselves from close confinement with each other. As the COVID-19 infection traveled through Rhode Island, it spread through one of its prisons as well. By May 26, 2020, 47 inmates out of 523 at the (private federal) Wyatt Detention Center "Wyatt" in Central Falls, Rhode Island, were testing positive for the virus, resulting in 32 then-active cases of COVID. *Yanes v. Martin,* 464 F. Supp. 3d 467, 472 n.7 (D.R.I. 2020). "Congregate living, such as nursing homes, cruise ships, aircraft carriers, and that at Wyatt and other detention facilities and prisons, magnifies the risk of contracting COVID-19." *Medeiros v. Martin*, 458 F. Supp. 3d 122, 125 (D.R.I. 2020). *See* Center for Disease Control and Prevention ("CDC") *Megan Wallace et al., "COVID-19 in Correctional and Detention Facilities – United States, February-April 2020* ("CDC Detention Report") (May 15, 2020).

The plaintiff, Timothy DeBritto, was then an incarcerated inmate at the state's Maximum-Security prison at the Adult Correctional Institutions ("ACI"), in Cranston, Rhode Island, about eleven miles south of Wyatt. Unlike Wyatt, however, the ACI had no known cases in Maximum Security in those early days. It was not until October 31, 2020, six months after the declaration of emergency, that the first inmate in that facility tested positive. (ECF No. 101-1, Clarke Affidavit at ¶ 6.) Mr.

DeBritto, who resided in the same Prudence-1 cellblock as the inmate testing positive, tested positive on November 13, 2020. He ultimately contracted COVID-19 and it is undisputed that he suffered a bout of the disease.[1]

Mr. DeBritto has filed this action under 42 U.S.C. § 1983, contending that the response of the three defendants – Patricia Coyne-Fague, the Director of the Rhode Island Department of Corrections ("DOC"), Jennifer Clarke, DOC's medical director, and Lynne Corry, the Warden of Maximum Security – was inadequate and demonstrated a reckless indifference to his right under the Eighth Amendment of the United States Constitution to be protected from known risks to his physical health. He maintains that he contracted COVID-19 as a direct result of that constitutional violation.

The plaintiff and all three defendants have filed Motions for Summary Judgment (ECF No. 92, 93, 95.)[2] The Court concludes, as explained below, that there is no genuine issue of material fact and that the defendants are entitled to summary judgment.

## II.   STANDARD OF REVIEW

---

[1] He contends that as of the date of his complaint, he continues to suffer COVID-19 symptoms, and it is well-documented that the coronavirus can cause symptoms long into the future. https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/index.html. Because of the Court's disposition of the pending motions, the extent of Mr. DeBritto's injury and illness need not be addressed.

[2] Defendant Clarke has argued that Mr. DeBritto's Motion should be denied because it was unaccompanied by a Memorandum and Statement of Undisputed Facts as the Court had advised in a text order of Aug. 22, 2022. That is true but, in the Court's opinion, not an adequate basis to deny his Motion when, as a *pro se* litigant, he has otherwise made his argument and his view of the facts clear.

The parties have filed Cross-Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug Inc.,* 895 F.2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56(e) Advisory Committee Notes). Summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a Motion for Summary Judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because

the opponent is unlikely to prevail at trial. … If the evidence presented 'is subject to conflicting interpretations, or reasonable [people] might differ as to its significance, summary judgment is improper.'" *Gannon v. Narragansett Elec. Co.,* 777 F. Supp. 167, 169 (D.R.I. 1991) (citing and partially quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure Civil,* § 2725, at 104 (1983)).

## III. DISCUSSION

### A. Record

The governing facts are not in dispute. Both the DOC defendants and Mr. DeBritto have submitted materials that demonstrate that the contest here concerns the adequacy of the DOC response, not the historical record of what steps were taken. Mr. DeBritto did not file a response to the Statements of Undisputed Facts the defendants filed (ECF Nos. 94, 96), but he did file an Affidavit stating the facts as he professes them to be (ECF No. 79.) The facts about the health risks presented by COVID-19, and such matters as the guidance of the CDC, are not in dispute (ECF No. 92); the facts about what steps were taken by those in charge of the ACI come primarily from affidavits of correctional officials upon which both the plaintiff and defendants rely. (ECF No. 101-1.)

At all relevant times, Mr. DeBritto was confined in cellblock Prudence-1 in Maximum Security. That cellblock consisted of three tiers of single-inmate, open-front cells. (ECF No. 101-1, Kane Affidavit at 3.) There are eight cellblocks in the Maximum-Security facility. *Id.,* Kane Affidavit at 6. On October 31, 2020, just after the first positive result at Maximum Security was reported, Prudence-1 was put into

a fourteen-day quarantine. (ECF No. 93-1, at 2.) Nonetheless, by November 13, 2020, nearly sixty inmates in Maximum Security had tested positive and the entire facility was put into quarantine. *Id.* Testing was widespread, but it generally took two days to obtain test results. (ECF No. 101-1, Kane Affidavit at 1.)

High-level correctional staff were meeting frequently with medical staff. Warden Corry declared she met with the Medical Director and other DOC officials about the November outbreak about 50 times. *Id.*, Corry Affidavit at 9. Director Coyne-Fague was meeting with Clark or other healthcare officials multiple times per day, every day. *Id.*, Coyne-Fague Affidavit at 10. When inmates first began to test positive, a small number were moved into cellblocks with other positive cases, but as the numbers began to grow, the facility had no available unused space to turn into positive-only cellblocks. (*Id.*, Corry Affidavit at 6.) There were only ten single occupancy rooms behind the medical dispensary. *Id.* Almost immediately, the conflict between what the plaintiff argues should have happened and what did happen arose: "cohort-isolation," a phrase which the parties use to mean housing positive cases with positives and negative cases with negatives, was rejected by the prison administration because a guiding principle emerged, prompted by CDC guidelines, to avoid whenever possible transporting inmates through the prison.[3]

---

[3] According to Warden Corry, the CDC Guidance of October 21, 2022 [sic], instructed facilities to minimize the mixing of people from different housing units. ECF No. 101-1. Corry Affidavit at 7. Presumably the date attributed to this guidance by Warden Corry in her Affidavit is in error.

Mr. DeBritto maintains that the refusal to adopt cohort isolation manifested a deliberate disregard of the known risk to his health of infection. Cohort isolation would require clearing a cellblock of negative cases, transferring them to other cellblocks, and moving in positive cases. Moreover, those who had been "exposed" could not reside close to negative cases because they, the exposed, could turn positive without warning. Finally, status could and did change in days: previously positive people became negative and previously negative people tested positive. To complicate matters, there were already in place housing restrictions involving inmate history, known enemies, and gang affiliations. *Id.*, Corry Affidavit at 7-8. The administration concluded that shuffling inmates around based on criteria constantly in flux would not be safe. On consultation with the Medical Director, Warden Corry opted to adopt a "quarantine-in-place" policy effective at the end of October 2020. *Id.*, Corry Affidavit at 8. Inmates were fed in their cells, recreation and other activities were restricted, showering was grouped by testing status, showers were cleaned between cohorts, and staff movement within facilities was also restricted. *Id.* Routine transfers of inmates were suspended, and no inmate could move through blocks other than their own in Maximum Security. *Id.*, Corry Affidavit at 7.

There is really no dispute about the above facts. Cohort-isolation instead of quarantine-in-place was discussed and clearly intentionally rejected by the prison

administration. That decision is the basis of Mr. DeBritto's complaint of deliberate indifference to his health.[4]

---

[4] Mr. DeBritto complains of three other circumstances that *are* a matter of factual dispute. First, he claims it was a non-medical ACI official, a Captain Duffy, who decided what protocols to follow. The defendants deny that Capt. Duffy played this role, but this dispute does not preclude summary judgment for many reasons. Mr. DeBritto puts forth no evidence in support of his allegation, whereas the defendants' affidavits support the assertion that the decision was made by Director Coyne-Fague and Warden Corry in consultation with the Medical Director and staff. Mr. DeBritto points to a letter referring to "guidelines and restrictions that Captain Duffy *has outlined*." (ECF No. 92-2, Exh. I(1) (emphasis supplied.)) But "outlining" is not creating, it is merely describing. Second, even had Capt. Duffy created the protocols, that might support deliberate indifference only if there were no medical officials participating in the decision and the record clearly belies that conclusion. Third, a non-medical official establishing protocols would not per se constitute an 8th Amendment violation if the protocols were adequate and based on medical guidance.

The second circumstance is Mr. DeBritto's assertion that correctional officers failed to follow the protocols and that the defendants were responsible for that failure. In support, he points to an email from Dr. Clarke on March 16, 2020, implying that positive cases should be separated. Even if there were evidence that this was an Order that was not followed, it occurred seven months before Mr. DeBritto contracted COVID-19, the protocols had changed in those seven months and the prevalence of COVID-19 by November was altogether different than it had been in March. *See Bayley's Campground, Inc. v. Mills,* 985 F.3d 153, 157 (1st Cir. 2021) (acknowledging the "dynamic nature of both the virus that has given rise to this pandemic and the public health response to it"). This limited evidence cannot support supervisory liability which requires a showing that supervisors either directed staff to disregard the policies or knew that they were doing so and ignored it. *Muata v. Hicks,* No. 21-3210, 2022 WL 2526692, at *2 (3rd Cir. July 7, 2022).

Finally, Mr. DeBritto maintains that an officer named Wheeler was working in Prudence-1 when he was supposed to be in quarantine. (ECF No. 92, at 14.) The evidence establishes that Officer Wheeler had been exposed to COVID-19 and was therefore supposed to be quarantined but was, instead, on duty in Maximum Security. Mr. DeBritto has offered no evidence, however, to establish causation between Officer Wheeler's exposed status and his own illness. By November 13, 2020, when Mr. DeBritto tested positive, dozens of others could have been the source of his infection, as nearly 60 inmates in Maximum Security were testing positive at the time. (ECF No. 101-1, Clarke Affidavit at 13.)

None of these factual disputes are material and none therefore preclude summary judgment.

### B. Applicable Law: Deliberate Indifference

The government has the obligation to safeguard the physical security of those it incarcerates, to protect them from known risks. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The authorities need not know of a precise risk, or foretell precise harm, but they must act to forestall a substantial risk of harm of which they are aware. *Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 65 (1st Cir. 2002). Because of the lack of control prisoners have over their own treatment, the government bears the burden of ensuring that a prisoner's medical needs are reasonably met with adequate and timely treatment. If prison personnel are "deliberately indifferent" to the "serious medical needs" of prisoners, their acts and omissions manifesting that indifference constitute "unnecessary and wanton infliction of pain" amounting to cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976).

An *Estelle* claim has two components: an objective one and a subjective one. The objective prong is met by a showing of a serious medical need and the subjective prong is met by a showing of deliberate indifference. *Martinez v. Blanchette,* C.A. No. 14-537L, 2015 WL 9315562, at *3 (D.R.I. Oct. 29, 2015). While "deliberate indifference" has been compared to "shock[ing] the conscience," *Torraco v. Maloney,*

923 F.2d 231, 235-36 (1st Cir. 1991), the application of law to facts indicates the standard is not quite so extreme as those words would imply.[5]

### 1. The Objective Prong.

A "serious medical need" is one that a physician has diagnosed as requiring treatment, *Martinez* at *3, or one that is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Perry v. Roy*, 782 F.3d 73, 78-78-79 (1st Cir. 2015) (citing *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir.1990)). There cannot be any question that the COVID-19 infection and the need to protect oneself from contracting it presented a "serious medical need." Nor do the defendants argue otherwise. The defendants' arguments concern whether the defendants showed deliberate indifference to the risk and to prevention of the spread of the virus. The plaintiff has thus met the first prong of the *Estelle* test.

### 2. The Subjective Prong

The bedrock requirement for proving deliberate indifference is that prison officials were aware that a substantial risk of harm to the prisoner existed (or drew an inference of substantial risk from facts of which they were aware) but disregarded it. *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011). "The

---

[5] "Shocks the conscience" was coined to denote violations of due process caused by unreasonable searches and seizures prior to the incorporation of the Fourth Amendment into the Fourteenth and thus referred only to extreme government action. *Rochin v. California,* 342 U.S. 165, 172 (1952). The Eighth Amendment requirement, by comparison, as applied by courts, does not compare to the stomach pumping at issue in *Rochin whose* hallmark was the actual violence done to the unconsenting defendant's body by the forcible insertion of an emetic solution through a tube.

fundamental question in any deliberate-indifference case is whether the defendants exhibited 'a sufficiently culpable state of mind.'" *Swain v. Junior,* 961 F.3d 1276, 1288 (11th Cir. 2020) (quoting *Farmer*, 511 U.S. at 834.) Awareness may be inferred if the risk is obvious, *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002), but in this case there is no doubt from the defendants' actions that they were acutely aware of the risk of contagion. Disagreements about proper medical care do not lay a foundation for Eighth Amendment violations. *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993) (upholding dismissal of claim with a finding that a physician's rejection of a prisoner's desire for physical therapy, drugs and rest was merely a disagreement about the proper course of treatment not deliberate indifference). Nor, generally, do disagreements about the adequacy of medical treatment. *E.g.*, *Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir. 1981) (finding that no deliberate indifference existed where there was no evidence that physical therapy was inadequate treatment for a wheelchair-bound prisoner).

The record here cannot support a conclusion of deliberate indifference and, indeed, attests to the careful consideration DOC gave to the risk. Clearly the question of whether to implement cohort-isolation or quarantine-in-place spawned legitimate disagreements. Along with seriously considering both options and following the CDC guidelines as much as possible, DOC took affirmative steps to try to control the spread of COVID-19. It immediately reduced inmates' exposure to each other by restricting or eliminating group activities, imposing in-cell meals, and terminating routine transfers within and between facilities. It instituted cleaning protocols and supplied

inmates and staff with cleaning and sanitizing material. It instituted testing of staff and inmates, monitoring the temperature and pulse of high-risk inmates, and distributing KN-95 masks to inmates testing positive. It imposed policies for staff which, perhaps not followed 100 percent, nonetheless were policies designed to minimize contagion.

Many cases challenging COVID-19 protocols in prisons have been litigated. Overwhelmingly, prison officials who enacted policies in a considered attempt to minimize the risk of contagion, have been found not to have met the standard for reckless or deliberate indifference. *See e.g.*, *Muata v. Hicks,* No. 21-3210, 2022 WL 2526692, at *1 (3rd Cir. July 7, 2022) (East Jersey State Prison at Rahway); *Valentine v. Collier,* 978 F.3d 154, 164 (5th Cir. 2020) (Wallace Pack Unit of Texas Dept. of Crim. Justice); *Robinson v. Washington*, No. 22-136, 2022 WL 855275, at *20 (6th Cir. May 5, 2023) (Kinross Correctional Facility, Michigan); *Rowe v. Buss,* No. 21-1182, 2021 WL 5232512, at *6 (7th Cir. Nov. 10, 2021) (Indiana State Prison); *Swain v. Junior,* 961 F.3d 1276, 1288 (11th Cir. 2020) (Miami Metro West Detention Center).[6] The measures taken in cases like these were similar to the measures taken

---

[6] In *Glennie v. Garland,* C.A. No. 21-231, 2023 WL 2265247, at *12 (D.R.I. Feb. 28, 2023), *adopted* 4/13/2023 by text order, a Magistrate-Judge of this Court found that the plaintiff could not withstand a Motion to Dismiss his action alleging inadequate contagion prevention measures at the Wyatt Detention Facility. There, however, the Court found the plaintiff had failed to allege more than generalized statements that the prison administration had not done enough. "Plaintiff must provide more than generalized allegations that [Wyatt] failed to adopt adequate COVID-19 protocols or that the Warden failed to do enough regarding overcrowding, prison movement or housing assignments to adequately control the spread of COVID-19." *Id.* In this case, the Court is ruling on summary judgment, not the plausibility of the claim, but in

here. *See, e.g.*, *Cameron v. Bouchard*, 818 F. App'x 393, 395 (6th Cir. 2020) (Oakland County Jail) (moratorium on visits, cleaning instructions, prepackaged meals, cancellation of group activities, promoting social distancing); *Wilson v. Williams,* 961 F.3d 829, 840-41 (6th Cir. 2020) (Elkton Federal Correctional Institution) (implementation of 6-phase action plan, canceling visits, screening, quarantining new inmates, ramping up testing, providing disinfectant supplies and masks).

"The Eighth Amendment does not mandate perfect implementation." *Valentine,* 978 F.3d at 165. Policies that are "short of perfect" do not equal a constitutional violation. *Id.* at 164. This Court is not in a position to determine whether DOC officials made the best judgment call or even a good one. "As judges, our conscribed role is not to assess whether prison officials could have done more to contain the virus – no doubt they could have . . . Our limited role is [] to determine whether [the defendant] has made the requisite showing that its efforts to combat COVID-19 satisfied the constitutionally required minimum." *Id.* at 158. The COVID-19 pandemic challenged the nation and taxed healthcare resources across the country and the world. The congregate circumstances of Maximum Security made the job of

---

any event Mr. DeBritto's allegations are specific, not generalized. His problem is the state of the evidence, not the legal sufficiency of his claim.

limiting infection and illness more difficult.⁷ "Failing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference." *Swain*, 961 F.3d at 1287.

### C. Adequacy of Treatment

The main thrust of Mr. DeBritto's complaint is the failure to isolate cohorts. In his Amended Complaint, however, he alludes to a failure on the part of ACI medical staff to treat him adequately when he contracted COVID-19. (ECF No. 18-1.) The only evidence in the record relating to treatment comes from the affidavit of Director of Nursing at DOC, Kimberly Kane. She attested that over-the-counter medications were readily available to all inmates but that there was no record of Mr. DeBritto requesting any. (ECF No. 101-1, Kane Affidavit at 2-3.) Nor was there a record of his revealing any symptoms that might have been relieved by over-the-counter medication. *Id.*, Kane Affidavit at 3. Even if Mr. DeBritto's medical care were less than satisfactory, for which there is no support in the record, he would have to surmount the obstacle that negligence, even if resulting in medical malpractice, is not a constitutional concern. *Feeney v. Corr. Med. Servs., Inc.,* 464 F.3d 158, 162 (1st

---

⁷ While not result-determinative, it is significant to note that the outbreak of November 2020, which began on October 31 with the first positive inmate at Maximum, was halted at least temporarily by the end of the month. There were no positive inmates after November 30, 2020, and the next positive result did not occur until February 2021. (ECF No. 101-1, Kane Affidavit Kane, at 3-4.) Although the rate of infection among prisoners was three times that of the general population, the two COVID-19 deaths in Rhode Island state prisons represented a fatality rate far less than that of the population at large. The Marshall Project, "A State-by-State Look at 15 Months of Coronavirus in Prisons," A State-By-State Look at 15 Months of Coronavirus in Prisons | The Marshall Project (July 1, 2021). Rhode Island was one of the first, if not the first, state to offer COVID-19 vaccines to its prisoners. *Id.*

Cir. 2006) (mere negligence is not enough). The threshold for an Eighth Amendment inadequate treatment claim is far higher. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106.

### D. Conclusion

This case is about the tension created by the desire to prevent infection by removing positive inmates from the cellblock and the simultaneous need to limit contagion by restricting movement of positive inmates through the facility. That tension reflected the prison's conflicting duties: on the one hand, it owed a duty of care to every individual inmate, including Mr. DeBritto, which might militate toward moving infected inmates away from him. On the other hand, it owed an equal duty of care to the population in general, which militated toward a policy that would slow the speed with which the virus spread throughout the facility by quarantining positive inmates in place. Mr. DeBritto's lamenting the choice that did not prioritize him as an individual inmate is understandable: whether he contracted COVID-19 because of that decision or not, he and everyone at Maximum Security, inmate and staff, faced a serious risk with severe consequences. But in choosing the alternative believed to be the most successful in protecting the facility's entire population, the prison's officials did not act unreasonably, and did not act in reckless disregard of the risk to Mr. DeBritto.

Mr. DeBritto's Motion for Summary Judgment (ECF No. 92) is DENIED. The Motions for Summary Judgment filed by the defendants (ECF No. 93, 95) are GRANTED.

IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge

August 1, 2023